IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

**TONYA DICKSON**                                                                                       **PLAINTIFF**

v.                           Case No. 4:23-CV-4071

**HEMPSTEAD COUNTY, ARKANSAS**                                          **DEFENDANT**

### PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

COMES NOW Plaintiff Tonya Dickson, by and through her attorneys Chris Burks of WH LAW, and for her Response to Defendant's Statement of Undisputed Material Facts, she states as follows:

1.  Hempstead County operates a public library, Hempstead County Library, in Hope, Arkansas (the "Library"). The Library is governed by a Board of Commissions appointed by the Hempstead County Quorum Court.

    RESPONSE: Admitted.

2.  Hempstead County Library employs five full-time employees: (1) a Director, Courtney McNiel, (2) an Assistant Director, Jamie Formby, (3) a Cataloguer, Vera Jackson, and two Clerks, (4) Wanda Whitley and (5) Kristina King.

    RESPONSE: Admitted.

3.  McNiel hired Plaintiff Tonya Dickson as a Clerk in January 2019. (McNeil Aff.)

    RESPONSE: Admitted.

4.  Dickson's responsibilities as the Clerk included general customer service of patrons, checking books in and out, reshelving books, and other various clerical duties as

assigned in the library. (Deposition of Tonya Dickson, p. 17, attached to Motion as Exhibit 2)

RESPONSE: Admitted.

5.  Upon beginning her employment with the Library, Dickson was provided a copy of the Hempstead County Employee Handbook, which includes provisions on discrimination and how to report suspected violations of the policy. (Dickson Dep. pp.18-19)

RESPONSE: Admitted.

6.  In the Fall/Winter 2022, McNiel began to notice that Dickson would often linger at one place in the library with no signs of any activity or work being completed. (McNiel Aff.) To corroborate these issues, McNiel would observe Dickson on the Library's security cameras malingering in one place without working or completing any task. (McNiel Aff.) McNiel recorded two of these episodes of Dickson on the security cameras on November 15 and 17, 2022. (McNiel Aff.; Dickson Dep. Exhibits 2 and 3)

RESPONSE: Admitted that McNiel stated that she observed these issues. Denied that Dickson's performance declined during this period or that Plaintiff's actions and behavior in the footage in the videos recorded by Defendant differed in any significant fashion from white clerks who worked for Defendant, who Plaintiff testified were "always on their cell phone, and always on Facebook, just social media" while at work. Defendant's Exhibit 2, 65:16-21. Plaintiff's testimony is supported by statements from library patrons in support of Dickson and her work ethic during her tenure with Defendant; one of whom stated that, "Some of the younger ones they have hired since her

Page 2 of 10

departure lack her work ethic. You have to clear your throat to get their attention from their phone or book they're reading to help you." Plaintiff's Exhibit A – Letters from Library Patrons, p. 2.

7. On one video, Dickson is meandering around the library floor from bookshelf to bookshelf doing nothing. On the other, Dickson is reading a book in the aisle near a bookshelf. (Dickson Dep. Exhibits 2 and 3)

RESPONSE: Admitted that Dickson is walking around the library floor in the first video and reading a book in the second video.

Dickson testified that the second video was taken "before the building opened up for patrons to come in." Defendant's Exhibit 2, 50:22-51:8. As the building was not open, Dickson would not have been able to perform her "primary job responsibility" of manning the circulation desk. Defendant's Exhibit 1, ¶ 5.

Dickson testified that part of the ongoing racial harassment she experienced from her coworkers and manager, who were all Caucasian, was the silent treatment, in that conversations would stop when she entered the room and she would be omitted from discussions about work events. Id., 22:9-23:15. In the first video, Dickson testified that her coworkers were moving books around without speaking to her about what was going on or giving her direction about what she was supposed to do. Id., 49:5-50:11.

8. Dickson confirmed it was her on the video and that she was "disassociating" or "zoning out" because she felt watched or targeted by the staff. (Dickson Dep. pp. 47-51) Dickson admits that the Assistant Director did approach her

while she was reading the book and commented, "Must be a good book." (Dickson Dep. p. 51)

RESPONSE: Admitted that Dickson made said statements, and that she offered additional explanation about the events captured in the videos, as described above.

9. McNiel also discovered that a significant percentage of the books that Dickson was responsible for reshelving were mis-shelved. (McNiel Aff.)

RESPONSE: Admitted that McNiel made this claim.

10. While Dickson denied mis-shelving books, she admitted that the Library tracks the activity of employees, including who is responsible for checking a book in, via an automated audit trail process for each book. (McNiel Aff.; Dickson Dep. pp. 44-45)

RESPONSE: Admitted that Dickson denied misshelving the books and that she admitted the Library tracked the activity of employees, including who was responsible for checking a book in. Dickson further denied that McNiel ever told her that "75 percent" of the books that she shelved were misshelved, as McNiel wrote in the verbal warning she issued to Dickson, which Dickson also never saw until after her termination. Id., 69:23-70:5 and 71:5-72:10. Further, McNiel stated that Dickson was a "good employee" with "no major issues for the first three and a half years of her employment," indicating Dickson shelved books correctly for over three years and then decided to start shelving the majority of books she handled incorrectly. Defendant's Exhibit 1, ¶ 4.

11. McNiel received a few complaints from patrons that Dickson had made them feel uncomfortable with religious conversations or "praying over" them while they were visiting the Library. (McNiel Aff.)

RESPONSE: Admitted that McNiel claimed patrons had complained about Dickson having religious conversations or praying over them while they were in the library. Dickson denied that she had religious conversations at work with patrons or coworkers, and testified that McNiel never provided any proof of complaints from patrons. Id., 45:25-46:13.

Defendant testified that all complaints from patrons about Dickson were made verbally, and were not "recorded or written down," conveniently preventing them from having to identify the patrons who complained about Dickson or who even witnessed her have religious conversations at work. Plaintiff's Exhibit B – Defendant's Discovery Responses, at Interrogatory 5. McNiel, Dickson's supervisor, did not testify that she ever witnessed Dickson pray or engage in a religious conversation at work, only that she relied on unnamed, unrecorded conversations with patrons who asserted Dickson did so. Defendant's Exhibit 1.

12. At no point during her employment did Plaintiff raise any internal reports of discrimination or violation of the County's discrimination policies. (**Ex. 1**)

RESPONSE: Admitted.

13. Based on the issues of standing around in one place for prolonged periods with no work tasks, mis-shelving a significant percentage of books and the patron complaints, McNiel decided to issue Dickson a verbal warning discipline. (McNiel Aff.) McNiel recorded the disciplinary conversation on two Verbal Warning Forms. (McNiel Aff.) McNiel delivered the verbal warning discipline to Dickson in a meeting on December 1, 2022, and Assistant Director Formby witnessed the meeting. (McNiel Aff.)

RESPONSE: Admitted that McNiel issued Dickson this warning. Denied that the performance described in the warning was an accurate description of Dickson's performance.

14. McNiel did not observe any noticeable improvement in Dickson's behavior after the December 1 meeting. (McNiel Aff.)

RESPONSE: Admitted McNiel made this statement.

15. McNiel continued to observe Dickson wander around the library, neglect her time at the circulation desk. (McNiel Aff.)

RESPONSE: Admitted McNiel made this statement.

16. McNiel would often prompt Dickson to return to her duties, before and after the December 1 discipline, with no sustained improvement. (McNiel Aff.)

RESPONSE: Admitted McNiel made this statement.

17. McNiel captured another security camera video of Dickson on December 8 where Dickson appears to close her eyes and nod off to sleep while sitting behind a computer. (Dickson Dep. Exhibit 4; McNiel Aff.) Dickson denies she was sleeping but has no coherent explanation when asked what she was actually doing in the video that explains her closing her eyes while sitting behind a computer. (Dickson Dep. pp. 52-53)

RESPONSE: Admitted that Dickson is sitting at a computer with her eyes closed in the video and that Dickson denied she was sleeping. Denied that Dickson offered "no coherent explanation" about her actions in the video. Dickson stated that this video was taken during "an annual non-discipline day" and that her coworkers were all "standing up there talking" for about "ten minutes," and that she "leaned over… stretching" for the

length of the 25-second video captured by Defendant, which they now produce as evidence that Dickson was such a poor performer that Defendant had cause to terminate her. Id., 53:7-20.

18. McNiel made the decision to discharge Dickson for her lack of improvement on attention to her job duties. (McNiel Aff.) McNiel and Library Board Member Jacob Jones met with Dickson to deliver the decision on January 19, 2023.

RESPONSE: Admitted that Dickson was discharged for pretextual reasons, which Defendant identifies as related to her performance. Admitted that McNiel and Jones terminated Dickson on January 19, 2023.

19. At no point during or after her employment did Dickson raise any internal reports of discrimination or violation of the County's discrimination policies. (McNiel Aff.)

RESPONSE: Admitted.

20. Dickson was not meeting the Library's legitimate job expectations. (McNiel Aff.)

RESPONSE: Denied. The supposed issues with Plaintiff's performance as articulated by Defendant include:

- Dickson having religious conversations with patrons, which cannot be substantiated by any written statements or testimony from unidentified statements, and which McNiel (Dickson's supervisor) does not state she ever witnessed;

- Dickson misshelving books, which Dickson denied, and which is belied by the fact that Dickson was a "good employee" with no disciplinary issues for three and a half years;

- and Dickson wandering around the library, not working, when one of the videos produced by Defendant to support this claim was taken prior to when the library opened and another is a 25-second clip of Dickson sitting at a desk while her coworkers stood nearby and talked.

Defendant's testimony is contradicted by statements from library patrons who saw Dickson at the library and described her as "always ready to help," "always polite," always greeting regular patrons by name, and "consistently working by reshelving books," cleaning and straightening the library areas, "greeting customers and meeting the needs they had," and generally working with such a "friendly demeanor" that patrons would go by the library "just to say hello to Tonya." Plaintiff's Exhibit A.

21.     There are no similarly situated co-workers who were treated more favorably than Dickson.

RESPONSE: Denied. Dickson was terminated for poor performance, including wandering the library and not working by assisting customers at the circulation desk. Dickson testified that her coworkers, all of whom were Caucasian, were "always on their cell phone, and always on Facebook, just social media" while at work. Defendant's Exhibit 2, 65:16-21. Plaintiff's testimony is supported by statements from library patrons in support of Dickson and her work ethic during her tenure with Defendant; one of whom stated, "Some of the younger ones they have hired since her departure lack her work ethic.

You have to clear your throat to get their attention from their phone or book they're reading to help you." Plaintiff's Exhibit A, p. 2.

Dickson further testified that Wanda Whitley, a Caucasian library clerk, also had a complaint from a patron who felt Whitley was asking too many personal, unwanted questions while she checked the patron out. Id., 93:25-94:10. Dickson testified that Whitley was verbally coached, but that no other action was taken against her and she was still employed by Defendant. Id., 94:25-95:3 and Defendant's Statement of Facts, ¶ 1.

22.     The Library has articulated a legitimate, non-discriminatory reason for discharging Dickson, specifically her job performance.

RESPONSE: Admitted that the Library has articulated this reason. Denied that this reason is accurate or an uncontested fact.

23.     There is no evidence that the Library's stated non-discriminatory reason for discharge was pretext for race discrimination.

RESPONSE: Denied. Dickson has given testimony and produced exhibits that exhibit that she was performing successfully in her position and that the performance deficiencies identified by Defendant were not true. To establish racial discrimination, Dickson has described disparate treatment in comparison to similarly situated Caucasian employees who were "always on their cell phone, and always on Facebook, just social media" while at work. Defendant's Exhibit 2, 65:16-21 and Plaintiff's Exhibit A, p. 2. After Plaintiff was terminated, Defendant promoted a Caucasian female to the Library Clerk position. Plaintiff's Exhibit B, at Interrogatory 6.

Finally, Dickson has identified ongoing racial harassment from her supervisor and coworkers, all of whom were Caucasian, which was exhibited through silent treatment, exclusion of Plaintiff from work related discussions, and most significantly, constant, ongoing comments about Plaintiff's racial characteristics and other topics related to her race. Id., 22:9-23:15. Specifically, Plaintiff testified that during George Floyd's murder trial, Plaintiff's Caucasian coworkers watched body cam footage of Floyd's arrest and death on YouTube while at work and made "offensive" comments about it. Id., 39:3-40:23. At other times, her coworkers asked her what her hair would "look like if it wasn't straightened" and Vera Jackson, the library Cataloguer, told her that "white people say black people be ashy." Id., 38:24-39:2. Further, Jamie Formby, the Assistant Library Director, made statements like, "who is Kamala Harris supposed to be, who is Michelle Obama supposed to be" and "Barack never did anything as the president." Id., 38:20-23. Plaintiff also testified to other derogatory statements made against "local blacks in the community." Plaintiff's Exhibit C – Plaintiff's Discovery Responses at Interrogatory 12.

Finally, Plaintiff testified that a coworker said that "Tonya is the only black lady with a flat butt" to which her boss, Courtney McNiel responded, "Tonya is white." Id., 37:10-17.

    Respectfully submitted,
**Tonya Dickson, PLAINTIFF**

    wh Law | We Help
    1 Riverfront Pl. – Suite 745
    North Little Rock, AR 72114
    (501) 891-6000

By:    Chris Burks (ABN: 2010207)
    chris@wh.law